UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NANA A. AMISSAH,<br><br>      Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>      Defendant. | Case No.:<br><br>**COMPLAINT**<br><br>PLAINTIFF DEMANDS<br><br>A TRIAL BY JURY |

Plaintiff, NANA A. AMISSAH ("Ms. Amissah" or Plaintiff), by her attorneys, MESIDOR, Attorneys at Law, PLLC, hereby complains of the Defendant META PLATFORMS INC., (hereinafter "META"), upon information and belief, as follows:

## NATURE OF THE CASE

1. Meta subjected Ms. Amissah to intentional and egregious discrimination and retaliation while she was on medical leave and pregnant. Accordingly, Ms. Amissah brings claims against Defendant META for discrimination based on race and disability, and for its retaliatory termination of her employment, which constitute violations of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); and the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA").

2. Defendant META discriminated against Plaintiff because of her race, gender, and disabilities. Defendant META retaliated against Ms. Amissah for complaining of the discrimination she was subjected to and for exercising her rights under the law by

1

unlawfully terminating Plaintiff when she was six months pregnant and out on medical leave.

3. Defendant's conduct was intentional, willful, and wanton and showed a reckless disregard for Plaintiff's well–being and the laws prohibiting discrimination and retaliation. Defendant's conduct caused and continues to cause Plaintiff to suffer substantial economic and compensatory damages, in addition to severe emotional distress and mental anguish.

## JURISDICTION AND VENUE

4. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332.   The parties are citizens of different states, complete diversity between the parties exists, and the amount of controversy exceeds $75,000. Further, this court has subject matter jurisdiction over this action as it arises under 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1981, *inter alia.*

5. Venue is proper in this Court pursuant to 28 U.S.C §1391(b)(1 because Defendant META, has had substantial contacts within this district and is subject to the Court's personal jurisdiction in this district.

6. Thus, Defendant META is a resident of this district and venue is proper in this judicial District.

## PROCEDURAL REQUIREMENTS

7. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 29, 2025.

8. On February 10, 2025, Plaintiff amended her EEOC Charge of Discrimination and Particulars.

9. On February 12, 2025, Plaintiff received a Notice of Right to Sue from the EEOC.  A copy of the notice is annexed to this complaint as Exhibit 1.

10. This action is being commenced within 90 days of receipt of the Notice of the Right to Sue.

## PARTIES

11. Plaintiff is a resident of the State of Maryland.

12. At all relevant times, Plaintiff was and is a "person" and was Defendant's "employee," entitled to protection as defined by federal laws.

13. Defendant, META, formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, California.

14. At all relevant times, Defendant META employs over fifteen employees and is thus subject to the requirements of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act (the "ADA").

15.  At all relevant times, Defendant META employs over fifty employees and is thus subject to the requirements of the Family Medical Leave Act ("FMLA"),

## MATERIAL FACTS

### *Background*

16. Plaintiff Ms. Amissah is a talented and dedicated technology professional with over fifteen years of exceptional experience working in the tech industry.

17. On or about June 5, 2017, Plaintiff began working at Facebook as a Program Manager, Partnerships Solutions and Operations, IC 6 (Individual Contributor).

18. Since starting as a Program Manager at Facebook, Plaintiff has held various roles and received several promotions at the company.

19. These positions and promotions include but are not limited to:

- Head of Platform Sustainability, Developer Partnerships; [Facebook]

- Head of Operations & Responsible Foresight Programs, Responsible Innovation [Facebook]

- Head of WhatsApp Programs [Facebook]

- Director, Global Programs, WhatsApp [Meta]

20. Plaintiff has successfully led companywide initiatives that have strengthened META's profile and increased its worth.

21. Plaintiff's numerous achievements working for Defendant, included spearheading and leading a companywide response to the high profile Cambridge Analytica scandal, as the Head of Platform Sustainability, Developer Partnerships, and as Director of Global Programs, building and leading a new function with WhatsApp in response to a $5 Billion FTC Consent Order against Meta.

22. Plaintiff was also the first Black female to be promoted to Director at WhatsApp/Meta.

23. In January 2023, Plaintiff began a new role as the Global Director, Business & Product Equity Partnerships & Programs within WhatsApp.

24. Throughout Plaintiff's time at Meta and its former and related entities, Plaintiff performed exceptionally. Over the past seven-plus years, Plaintiff received approximately 18 performance reviews and never received an annual performance review below "Meets Expectations.".

25. During Plaintiff's time working as the Global Director, Business & Product Equity Partnerships & Programs at Meta, Plaintiff was supervised by and reported to John Cantarella, the Vice President of Global Scaled Partnerships.

26. Mr. Cantarella is white and/or Caucasian.

4

***Ms. Amissah Suffered Discrimination and a Hostile Work Environment***

27. Ms. Amissah's exemplary career has been marred by a despicable campaign of discriminatory and disparate treatment by Mr. Cantarella based on her race.

28. Shortly after beginning her role as Global Director, Plaintiff experienced a stark change in her work environment due to discriminatory treatment from Mr. Cantarella.

29. Mr. Cantarella's conduct, including denying critical resources, creating inconsistent expectations, and failing to support Plaintiff's team, contrasted markedly with his treatment of non-Black peers in leadership roles. This pattern of discrimination and microaggressions created a hostile work environment.

30. During the first three months of Plaintiff's new role, she quickly began to realize that Mr. Cantarella exhibited racial animus toward her and treated her differently than her non-Black peers and/or colleagues.

31. Mr. Cantarella's conduct evidenced this racial animus and differential treatment. His conduct also demonstrated an intent to sabotage Plaintiff's performance and set Plaintiff up to fail.

32. For example, Mr. Cantarella treated Plaintiff and her team differently than her non-Black peers with respect to budget allocation and budget transparency.

33. Mr. Cantarella repeatedly refused to provide Plaintiff with clarity regarding her team's budget and subjected her team's budget to heightened scrutiny as compared to other teams that reported to him, which were predominantly led by non-Black Meta directors/employees.

34. Mr. Cantarella constantly subjected Plaintiff to a "moving goal post" by refusing to provide Plaintiff with clear expectations and regularly and arbitrarily rearranging Plaintiff's work priorities without justification or reason.

35. This made Plaintiff's job exceedingly more difficult. Plaintiff faced heightened expectations and scrutiny from Mr. Cantarella as compared to her non-Black peers, which was compounded by the lack of support from Mr. Cantarella.

36. Unlike her non-Black peers, who received consistent support and direction, Ms. Amissah was held to arbitrary and constantly evolving standards. This created an untenable situation in which her team's mission and objectives were frequently revised, impeding her ability to achieve stability or success.

37. Mr. Cantarella frequently disregarded and ignored Plaintiff's comments and contributions during team and leadership meetings.

38. In May 2023, Plaintiff learned that Mr. Cantarella terminated members of Plaintiff's team without informing her of the impending terminations. Mr. Cantarella informed his non-Black reports who were directors of layoffs on their teams prior to implementing the layoffs.

39. During this time, company-wide layoffs impacted multiple teams. When other teams were impacted, Mr. Cantarella spoke with the team's directors and discussed changes with them so that the directors were informed and could provide input.

40. Mr. Cantarella did not afford this same treatment and opportunity he afforded Plaintiff's non-Black peers to Plaintiff.

41. Mr. Cantarella did not inform Plaintiff of layoffs on her team and did not provide her with an opportunity to provide input.

42. Plaintiff was then left with a team of a total of three people, including herself, to serve an organization of 700+ individuals.

43. In June 2023, Plaintiff spoke with Mr. Cantarella regarding his decision not to involve her in decision-making or at least inform Plaintiff about the layoffs and changes to her team, beforehand.

44. Plaintiff raised her concerns professionally and amicably. Plaintiff framed the issue as an opportunity to build trust, collaborate more closely with Mr. Cantarella, and develop better communication.

45. In response, Mr. Cantarella became defensive and combative. He falsely accused Plaintiff of being "unavailable" and regularly canceling their 1:1 meetings, as a way to justify leaving Plaintiff out of crucial decision-making processes.

46. This was the first time Plaintiff had heard this "feedback" which was contradicted by the fact that Plaintiff rarely canceled or rescheduled her 1:1 meetings with Mr. Cantarella.

47. Plaintiff was forced to implement an exhaustive process of countering Mr. Cantarella's false accusations, made to make her look incompetent or low performing, by providing evidence to the contrary.

48. Mr. Cantarella was not invested in Plaintiff or her team's work, as he should have been as her supervisor.

49. Mr. Cantarella denied Plaintiff's team needed resources and budgeting due to his racial animus toward Plaintiff and desire to see her fail in her position at Meta.

50. Mr. Cantarella continued to discriminate against and subject Plaintiff to microaggressions during this period.

51. As a result, Plaintiff had no other option but to report Mr. Cantarella.

52. On or about June 14, 2023, Plaintiff spoke with Helen Cunningham, an Employee Relations Business Partner at Meta, regarding the differential treatment, belittling, sabotage, and hostility to which Mr. Cantarella had subjected her.

53. Plaintiff discussed her concerns with Ms. Cunnigham related to but not limited to the following:

   a.  Mr. Cantarella was not invested in and obstructed Plaintiff's work and her team's work.

   b.  Mr. Cantarella failed to provide clarity regarding Plaintiff's team's budget and resources.

   c.  Mr. Cantarella under-resourced her team and failed to provide her and her team with support, including with Analytics, despite her numerous requests and the fact that it was essential component of her job.

   d.  Mr. Cantarella failed to provide transparency or clarity regarding work cycles and dynamics and constantly shifting priorities, which set Plaintiff up for failure.

   e.   Mr. Cantarella undermined Plaintiff leadership and management of her direct reports by directly contacting them and micromanaging them, instead of speaking with Plaintiff and allowing her to supervise her direct reports.

   f.  Plaintiff also informed Mr. Cunningham that she was constantly subjected to bias and microaggressions from Mr. Cantarella, who, for example, undercut her during leadership meetings and ignored and disregarded her comments during meetings.

   g.  Mr. Cantarella repeatedly questioned Plaintiff's capabilities and undermined Plaintiff, which led others, including Plaintiff's direct reports, to question her leadership.

h.  Mr. Cantarella did not treat Plaintiff's non – Black peers in this manner.

54. Plaintiff's complaints to Ms. Cunningham fell on deaf ears.

55. Ms. Cunningham assured Plaintiff she would investigate and look into Plaintiff's concerns and complaints, but Plaintiff did not receive a response.

56. The pervasive discrimination hostile work environment Plaintiff was subjected to by Mr. Cantarella began to take a toll on Plaintiff in or about June 2023.

57. As a result of the emotional distress caused by Mr. Cantarella's discriminatory treatment toward her, Plaintiff began treatment with a clinical psychologist in June 2023.

58. On or about June 14, 2023, Plaintiff informed Mr. Cantarella that she would need to take medical leave due to the effect of the work environment on her and her health.

59. After learning of her upcoming leave, Mr. Cantarella acted colder toward Plaintiff.

60. Plaintiff took medical leave for approximately three months. During this time, Plaintiff continued to be treated by a clinical psychologist and received career therapy.

61. Plaintiff returned to work in September 2023.

62. After Plaintiff returned from leave, the discriminatory treatment she faced at Meta intensified.

63. Mr. Cantarella continued to exclude Plaintiff from key meetings and communications related to her position.

64. For example, Plaintiff informed Mr. Cantarella that she wanted to become more involved with the Global Partnerships Leadership team to identify opportunities for Equity Integration. Because Plaintiff's team was so small, Plaintiff took on the heavy role of serving as an Individual Contributor to drive equity integration for Scaled Partnerships, while also serving in a leadership & people management role as Director for the Business

& Product Equity team. No other directors who reported to Mr. Cantarella had to take on multiple roles because their teams were well-resourced.

65. Despite being nine months into the role, Mr. Cantarella made almost no introductions to senior leaders to help facilitate Plaintiff developing partnership opportunities.

66. Plaintiff witnessed Mr. Cantarella making introductions and taking her white and non-Black colleagues, who were often more junior, to leadership meetings.

67. In October 2023, Plaintiff presented a framework of the business equity strategy she developed for what her team could accomplish, despite being short-staffed, while serving an organization of over 700 individuals (on the Global Partnerships team). Plaintiff developed a model and comparable mapping of teams doing similar work and the resources they received from Meta. Plaintiff hoped to engage in a conversation regarding the allocation of work and resources so that her team could meet its goals, like other teams.

68. Mr. Cantarella was not receptive to Plaintiff's proposal. He stated that there would be no support for Plaintiff's team because the budget was "down" and there would need to be more cuts to vendor costs. This effectively tied Plaintiff's hands and further set her and her team up for failure, due to no fault of her own.

69. Other teams were well-resourced and had many full–time and contractor staff. Whereas Plaintiff's team was the smallest team reporting to Mr. Cantarella and was given the least resources. Other Global Partnership team sizes included 23, 25, and 97 reports, compared to 2 reports on Plaintiff's team.

70. Plaintiff and her team were also often instructed to repeat and redo work, without being provided with a reason for doing so. Mr. Cantarella was not invested in Plaintiff's work and sought to undermine Plaintiff's performance and success any chance he could. This

was evidenced by the lack of attention and support for the work of Plaintiff and her team, *inter alia.*

71. Further, Mr. Cantarella's conduct indicated a lack of trust in Plaintiff's work and capabilities, which was not based on any credible or objective reason.

72. In December 2023, Mr. Cantarella exhibited significant differences in how he handled budget approval for Plaintiff's team compared to other teams in Scaled Partnerships. Plaintiff had to fight harder than other directors for a budget that was a small fraction compared to other teams.

73. This and similar differential and disparate treatment continued throughout 2024.

74. Despite Plaintiff's attempts to address Defendant's conduct upon her return in September 2023, Defendant's discriminatory and retaliatory treatment continued unabated, culminating in a biased performance review in March 2024.

75. In March 2024, Plaintiff received a retaliatory performance review from Mr. Cantarella.

76. In the review, although Plaintiff was rated "Meets All" expectations, the review contained negative written feedback that did not align with Plaintiff's actual job performance.

77. Much of the negative feedback she received conflicted with recent written feedback Plaintiff received from cross-functional partners.

78. Further, the negative feedback from Mr. Cantarella was the first time she had heard any such concerns.

79. Mr. Cantarella's negative review of Plaintiff's performance was done in retaliation for Plaintiff reporting his discriminatory conduct toward her and was intended to undermine Plaintiff and impact her professional reputation.

11

80. Plaintiff met with Mr. Cantarella to discuss the performance review and her concerns with it not being an accurate reflection of her performance that would stay on her record for years. However, the meeting was not productive.

81. Mr. Cantarella continued to subject Plaintiff to discriminatory treatment and a hostile work environment.

82. Mr. Cantarella continued to grossly under-resource Plaintiff's team, subject Plaintiff to a heightened performance standard, and gave Plaintiff overbroad criticism without providing examples or guidance regarding how to resolve his purported concerns.

83. Upon information and belief, Mr. Cantarella also impeded Plaintiff's efforts to be transferred to an internal role at Meta.

84. In May 2024, after a weekly 1:1 meeting between Plaintiff and Mr. Cantarella, Plaintiff shared her Individual Contributor Goals at Mr. Cantarella's request. Mr. Cantarella responded by accusing Plaintiff of including goals that other people were executing, implying that she was dishonest and neglected her duties, among other things.

85. Mr. Cantarella's accusation was blatantly false and inaccurate.

86. The following day, Plaintiff sent Mr. Cantarella an email update clarifying her goals and providing objective evidence of the work she had been focusing on executing.

87. Plaintiff copied Human Resources on this email as she felt Mr. Cantarella was setting her up to be pushed out or terminated for performance issues.

88. Mr. Cantarella was dismissive in response and continued to unjustifiably attack Plaintiff's performance and conjure up performance issues related to Plaintiff.

89. Shortly thereafter, Plaintiff met with ERBP Ms. Cunningham and Sheryl Weaver, a Human Resources employee at Meta.

90. Plaintiff explicitly reported Mr. Cantarella for racial discrimination and outlined how he treated Plaintiff differently and worse than her non-Black peers at Meta.

91. Despite reporting Mr. Cantarella's conduct to Ms. Weaver and Ms. Cunningham on multiple occasions, the discriminatory conduct and hostile work environment Plaintiff suffered under remained unchanged.

92. Instead of addressing her concerns, Meta's leadership did not provide any response, which emboldened Mr. Cantarella to continue his discriminatory behavior.

93. In June 2024, Ms. Amissah's ongoing experiences with discrimination and retaliation led to severe mental and physical distress, including panic attacks and depression.

94. Plaintiff has been diagnosed with Severe Anxiety, Severe Depression, Panic Attacks, and PTSD due to the discriminatory treatment and hostile work environment she experienced at Meta.

95. As a result of the discriminatory treatment to which Mr. Cantarella and Meta subjected Plaintiff, and its impact on her health, at the advice of her medical doctors, Plaintiff took a second medical leave beginning on June 4, 2024.

96. Plaintiff was scheduled to return to work on or about September 23, 2024.

97. However, because Meta failed to hold Mr. Cantarella accountable for the discrimination and hostile work environment he created and subjected Plaintiff to, Plaintiff retained legal counsel to advocate for her.

98. Plaintiff became pregnant in November 2024 and informed Meta of her pregnancy status.

99.  In or about October 2024, Plaintiff's attorney began discussions with Meta regarding the violations described herein and started negotiating an agreement with Meta that would enable Plaintiff to separate from the Company while being compensated for the damages

13

Meta caused her, including pain and suffering and severe emotional distress damages. These discussions actively continued into February 2025.

100. Nonetheless, without warning, Meta terminated Plaintiff's employment on February 10, 2025 (effective April 18, 2025) while Plaintiff was pregnant and on FMLA leave.

101. Meta included Plaintiff in the mass termination of employees for purported low performance, despite the fact that Plaintiff never received an annual performance review below "Meets Expectation."

102. Meta's justification for Plaintiff's termination was pretextual and amounts to retaliation for engaging in protected activity, i.e. Plaintiff taking medical leave and reporting discrimination.

103. More egregiously, Meta was aware that Plaintiff was six months pregnant and had no valid prior performance issues that would justify her termination.

104. Thus, in terminating Plaintiff's employment, Meta violated the Pregnant Workers' Fairness Act.

105. Meta's false portrayal of Plaintiff as an underperforming employee directly contradicts the previous stellar performance reviews Plaintiff received that led to her being awarded several performance-based bonuses and the like.

106. Meta not only discriminated against Plaintiff in the terms and conditions of her employment because of her race and for reporting racial discrimination, but Meta also interfered with her right to leave and retaliated against her for taking leave.

107. Non-Black employees, and non-pregnant employees, who do not have disabilities or are pregnant were not treated in this manner by Meta and were not pretextually terminated without proper reason or justification, as was Plaintiff.

108. Meta's actions as described herein are unconscionable and constitute blatant violations of the law, including violations of Title VII, Section 1981 and the FMLA.

**AS A FIRST CAUSE OF ACTION**
**FOR DISCRIMINATION AND RETALIATION**
*(In Violation of Title VII of the Civil Rights Act of 1964)*

109. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if the same were set forth herein fully at length.

110. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1) provides in pertinent part, that:

> It shall be an unlawful employment practice for an employer to … discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

111. Plaintiff is a member of protected classes in that she is a woman, pregnant, Black and African American.

112. Defendant engaged in unlawful employment practices prohibited by this section by discriminating against Plaintiff because of her race and gender.

113. Defendant discriminated against Plaintiff as described herein.

114. Defendant's unlawful treatment of Plaintiff includes but is not limited to severe and pervasive discrimination and gaslighting, downsizing her team without notice, under-resourcing Plaintiff's team, falsifying a negative performance review of Plaintiff, and subjecting Plaintiff to heightened scrutiny compared to her non-Black peers, *inter alia.*

115. Defendant META discriminated against Plaintiff based on her sex and race by subjecting her to differential and worse treatment that altered the terms, conditions, and privileges of her employment.

116. Defendant also subjected Plaintiff to adverse employment actions, including but not limited to discrimination, retaliation, and termination, based on her sex/gender and race because she complained of the discrimination to which she was subjected.

117. Defendant unlawfully discriminated and retaliated against Plaintiff by subjecting her to disparate treatment, a hostile work environment, and retaliatory actions following her complaints of discrimination, *inter alia.*

118. As a result of Defendant's actions, Plaintiff was humiliated, degraded, victimized, emotionally distressed, denied opportunities, and caused to suffer monetary loss and damages.

119. As a result of the acts and conduct complained of herein, Plaintiff has suffered emotional pain, inconvenience, wrongful exclusion, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

120. Defendant's conduct was intentional, malicious, willful, and conducted with full knowledge of the law.

121. Plaintiff is entitled to the maximum amount of damages allowed under this statute.

**AS A SECOND CAUSE OF ACTION**
**FOR DISCRIMINATION AND RETALIATION**
*(In Violation of Section 1981 of the Civil Rights Act of 1866)*

122. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if the same were set forth herein fully at length.

123. 42 U.S.C. § 1981 states in relevant part the following:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like

16

punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

124. Defendant engaged in unlawful and unconstitutional employment practices prohibited by the above-referenced section by discriminating against Plaintiff because of her race (Black and African American) in that it subjected Plaintiff to disparate, differential, and worse treatment.

125. Defendant's unlawful treatment of Plaintiff includes but is not limited to severe and pervasive discrimination and gaslighting, downsizing her team without notice, under-resourcing Plaintiff's team, falsifying a negative performance review of Plaintiff, and subjecting Plaintiff to heightened scrutiny compared to her non-Black peers, *inter alia.*

126. Defendant subjected Plaintiff to illegal adverse action by terminating her employment after she complained of the discrimination and retaliation to which she was subjected.

127. Defendant did not subject Plaintiff's non - Black peers and colleagues to said discriminatory and disparate treatment to which they subjected Plaintiff.

128. By reason of the foregoing, Plaintiff is entitled to damages including but not limited to back pay, front pay, compensatory, emotional distress, and punitive damages.

**AS A THIRD CAUSE OF ACTION**
**FOR DISCRIMINATION AND RETALIATION**
*(In Violation of the Americans with Disabilities Act ("ADA"))*

129. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if the same were set forth herein fully at length.

130. Section 12112 of the ADA, entitled "Discrimination" provides in relevant part:

(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

17

131. 42 U.S.C. § 12203 provides:

> Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

> Interference, coercion, or intimidation. It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

132. Plaintiff's diagnoses of severe depression, severe anxiety, PTSD, and panic attacks qualify as diagnoses under the ADA.

133. Plaintiff's pregnancy status constitutes a disability under the ADA.

134. Defendant is a covered entity under the ADA.

135. Defendant was aware of Plaintiff's disabilities.

136. Defendant failed to engage in an interactive process to determine whether an accommodation could be offered to Plaintiff after it became aware of her disabilities.

137. Defendant discriminated and retaliated against Plaintiff after she took leave as described herein and when it terminated her employment.

138. Defendant knowingly and intentionally discriminated and retaliated against Plaintiff based on her disabilities as described herein.

139. Defendant acted intentionally and with malice and/or reckless indifference to Plaintiff's federally protected rights under the ADA.

140. By reason of the foregoing, Plaintiff is entitled to damages including but not limited to back pay, front pay, compensatory, emotional distress, and punitive damages.

**AS A FOURTH CAUSE OF ACTION**
**FOR FMLA INTERFERENCE AND RETALIATION**
*(In Violation of the Family Medical Leave Act ("FMLA"))*

141. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if the same were set forth herein fully at length.

142. Section 2612(a)(1) of the Family Medical Leave Act states in pertinent part: an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:…(C) In order to care for the spouse… of the employee, if such spouse… has a serious health condition; (D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

143. Section 2615 of the Family Medical Leave Act, states in pertinent part:

> Interference with rights. (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter. (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

144. Plaintiff's medical diagnoses as described herein constitute serious medical conditions.

145. Defendant interfered with and retaliated against Plaintiff for exercising rights protected by the FMLA.

146. Defendant had no good faith basis or business justification for any of the actions taken against Plaintiff as alleged herein.

147. As a direct and proximate result of Defendant's unlawful conduct in violation of the FMLA, Plaintiff has suffered lost compensation and benefits and has been damaged as set forth herein.

148. By reason of the foregoing, Plaintiff is entitled to damages including but not limited to back pay, front pay, compensatory, emotional distress, and punitive damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendant:

A.  Declaring that Defendant participated in unlawful practices prohibited by Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, the ADA, and the FMLA, in that Defendant discriminated against Plaintiff on the basis of her race, gender, and disabilities, *inter alia;*

B.  Awarding damages to Plaintiff for all lost wages and benefits resulting from Defendant's unlawful discrimination, and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.  Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.  Awarding Plaintiff punitive damages;

E.  Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of the action;

F.  Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendant's unlawful employment practices.

Dated: New York, New York
      May 9, 2025

                            **MESIDOR PLLC**
                            **ATTORNEYS AT LAW**

                    **By: /s/**_____*Marjorie Mesidor*_____
                            Marjorie Mesidor
                            Itohen Ihaza

**Mesidor, PLLC**
*Attorneys for Plaintiffs*
30 Station Road, Suite 5
Bellport, New York 11713
T: (212) 930-6010
mm@marjoriemesidor.com
II@marjoriemesidor.com